Filed 5/4/21  P. v. Allen CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>ERIC ELIJAH ALLEN,<br><br>    Defendant and Appellant. | G058527<br><br>(Super. Ct. No. 18CF3129)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Julian W. Bailey, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Eric Elijah Allen was convicted of pandering for procuring Jane Doe 1 and Jane Doe 2 for the purpose of prostitution.[1] The jury also found appellant guilty of kidnapping JD1 and assaulting her with force likely to cause great bodily injury. Appellant now contends: 1) The trial court erred in admitting certain phone evidence because it was not properly authenticated, 2) the prosecution's expert witness on prostitution exceeded the scope of permissible expert testimony, and 3) his sentence violates equal protection principles. As respondent concedes, appellant's second contention has merit. However, even without the impermissible portions of the expert's testimony, it is not reasonably likely appellant would have a received a more favorable verdict at his trial. We therefore affirm the judgment.

FACTS

In November 2018, appellant and the victims were staying together in a room at the Ana Mesa motel in Costa Mesa. The motel is located in an area known as "The Track" or "The Blade," where prostitution activity is endemic.

On the morning of November 4, JD1 frantically entered the lobby of the motel and used the front desk clerk's phone to call 911. Looking scared and nervous, she told the dispatcher she needed help because appellant was holding her against her will and forcing her into prostitution. She also said appellant was holding JD2, but she might not want to leave appellant because she had nowhere to go.

While JD1 was waiting for the police to arrive, appellant entered the lobby and confronted her. Although she did not want to leave, appellant yanked her out of her chair, put her in a headlock, and hauled her out into the parking lot. He was hitting her and trying to force her into his car when the police pulled up to the scene. At that point, appellant fled on foot, but officers soon captured him. When they searched him incident to arrest, they found an Android phone and $145.

---

[1] We will refer to Jane Doe 1 and Jane Doe 2 collectively as the victims, and individually as JD1 and JD2.

Meanwhile, JD2 had appeared on the scene back at the motel parking lot. She and JD1 were arguing and yelling so intensely the police had to separate them for fear of further violence.[2] Once things settled down, officers searched appellant's car and discovered the victims' iPhones. JD2's phone was found inside her purse, on the front passenger seat, and JD1's phone was tucked away in the trunk, along with her identification and social security cards.

The victims did not testify at trial. However, the violent interaction that took place between JD1 and appellant at the motel was captured on surveillance tape and played for the jury in court, as was a recording of JD1's 911 call. In addition, the prosecution presented a considerable amount of evidence regarding what investigators discovered on appellant's and the victims' phones.

On JD1's phone, investigators found a variety of text messages between the victims and appellant in which the victims referred to appellant as "Daddy" and kept him posted about various "dates" they are going on. Following one of the dates, the victims sent appellant a photo of them holding a stack of money. And after another, JD1 sent appellant a message complaining about the genitalia of one of her clients. In his reply, appellant told JD1 to do whatever she needed to do to keep the client happy.

Besides the text messages, JD1's phone contained photos of the victims posing provocatively on appellant's car. There also was a photo of the victims posing in lingerie with the name "Moe Dollas" emblazoned at the top.

On JD2's phone, investigators found confirmations for various online "dating" advertisements that were posted on a website commonly used by prostitutes. Among other things, the ads mentioned two girl specials and "black pussy" and were adorned with provocative photographs of the victims. In addition to the ads, JD2's phone also contained numerous memes that referenced pimping and prostitution. And it

---

[2] Apparently, JD2 was not happy with JD1's decision to call the cops on appellant.

contained multiple photos of appellant along with the names "Moe Dollas" and "King Dolla."

One of those photos was from appellant's Instagram account. It featured appellant and JD1 holding stacks of money along with a post that read, "[T]his is what happens when you got a nigga with a dream & a female that listens[.]" Other posts on appellant's account included one that said "slow feet don't eat" and another that read "get a bag or get lost" that was accompanied by an emoji money bag.

When investigators searched appellant's phone, they discovered more photos of the victims and appellant's car. They also found various text messages from the victims, as well as text messages from prospective sex customers, commonly known as "Johns." In the messages, appellant provided the Johns with information about meeting places and pricing for various sex acts. And he often inquired of the Johns if they were associated with law enforcement. Appellant's phone also contained text messages from a person identified as "Shybaby." In one exchange, appellant candidly told Shybaby that he was "about to hit the blade" and go out pimping.

At trial, the prosecution called Costa Mesa Detective Josef Saar as an expert witness on the subculture of prostitution and pimping. He testified the prostitution business is all about making money for the pimps, who wield enormous power over their prostitutes. In fact, Saar said prostitutes are worked tirelessly and have to turn over all of their earnings to their pimp. And oftentimes they have to call their pimps "Daddy" or "King," to underscore their subservient role in the relationship.

In addition to explaining how pimps and prostitutes generally go about their business and communicate with each other, Saar testified about the specific information that was found on the phones. In Saar's opinion, the messages, memes, emojis, photos and ads on the phones showed appellant was pimping the victims and holding them against their will.

Despite Saar's opinions in that regard, the jury found appellant not guilty of pimping and deadlocked on the charge of human trafficking, which was later dismissed by the court. (Pen. Code, §§ 266h, subd. (a) & 236.1, subd. (b).) However, as noted at the outset, the jury did convict appellant of pandering, kidnapping, and aggravated assault. (Pen. Code, §§ 266i, subd. (a)(1), 207 & 245, subd. (a)(1).) Given appellant's criminal record, which included a prior strike conviction, the court sentenced him to 26 years and 4 months in prison.

## DISCUSSION

### *The Phone Evidence*

Appellant contends the prosecution failed to authenticate or lay a proper foundation for the text messages, advertising photographs and Instagram posts that were found on the phones. We disagree.

The phone evidence was presented through the testimony of Detective Saar and his partner Jaime Santibanez, who was one of the officers who responded to the Ana Mesa motel in response to JD1's 911 call. Santibanez testified that after the victims were taken into custody, he spoke with them individually at the police station. During their respective interviews, the victims gave him the passcodes to their phones, and he reviewed the contents of their phones with them. Appellant's phone was also accessed, pursuant to a judicially-authorized search warrant. As part of the investigation, the contents of all three phones was downloaded using a Cellebrite data-transfer device.

Santibanez testified the Cellebrite device is widely used by law enforcement and is approved for use by his department. And once a phone is hooked up to the device, its contents cannot be altered. He said, "As soon as you plug [the phone into the device], you follow the instructions, and it just downloads all the information, pictures, messages" from the phone. However, because Santibanez had no formal training on how to use the device, the downloading in this case was performed by Saar and a Detective Bak, both of whom have specialized training in that area. Bak did not

5

testify at trial, so it fell largely to Saar to describe to the jury how the Cellebrite system works.

Saar explained the Cellebrite data-transfer device operates hand in hand with a software program that is manufactured by Cellebrite. Once a phone is hooked up to the device, the software program creates a forensic image of the phone's contents as part of the downloading process. Then it translates that information into a readable format known as an extraction report. Those reports, Saar said, allow investigators to review data on the phone, including messages, photographs and search history.

Saar and Santibanez both reviewed the extraction reports that were generated in this case. Thus, even though Santibanez was not actively involved in the downloading process, he was able to see what was found on the phones. When asked if the information in the extraction reports matched the information he saw on the phones, Santibanez answered in the affirmative. He also said the reports were generally consistent with reports he had seen while working on other cases in the past.

At trial, the prosecution introduced into evidence seven extraction reports that were generated from appellant's phone. One of the reports reflected appellant's text messages with JD1, one reflected his text messages with the person identified as Shybaby, and the remaining five reflected his text messages with suspected Johns. Appellant contends these extraction reports were inadmissible for two reasons. First, the prosecution failed to establish the Cellebrite data-transferring system is generally reliable or was working correctly when it was used in this case. In other words, appellant claims there was insufficient evidence to prove the extraction reports were accurate and reliable. Second, appellant assails the reports as inadmissible hearsay.

The problem is, appellant did not object to the extraction reports *on any basis* when they were offered into evidence by the prosecution. Therefore, he has forfeited his right to challenge them on appeal. (Evid. Code, § 353; *People v. Cage* (2015) 62 Cal.4th 256, 287.)

6

Appellant attempts to avoid this result by arguing his attorney was ineffective for failing to object to the extraction reports. (See *Strickland v. Washington* (1984) 466 U.S. 668 [the Sixth Amendment guarantees criminal defendants the right to competent representation at trial].) However, because "[a]n attorney may choose not to object for many reasons, . . . the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) "If, as here, the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation." (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Defense counsel was never asked to explain why he did not object to the accuracy of the extraction reports, but that failure can be explained in light of the testimony provided by Saar and Santibanez. Both of them testified the Cellebrite system is widely used in law enforcement. In addition, Santibanez said the extraction reports were similar to reports he had seen in other cases, and the specific information contained in the reports matched what he had personally observed on the phones.

If that wasn't enough to prove the information in the extraction reports was accurate, the prosecution introduced screen shots (i.e., photographs) that Santibanez took of various text messages that were found on JD1 and appellant's phones. The information reflected in those messages was identical to the information in the extraction reports, which is strong proof the Cellebrite system was working properly, and the extraction reports were accurate. In the absence of any other evidence on the point, we cannot fault defense counsel for failing to object to the extraction reports on accuracy grounds.

As for counsel's failure to object to the extraction reports on hearsay grounds, the law is clear that when a report is produced by a person, such as a doctor or a police officer, it is subject to exclusion under the hearsay rule. (*People v. Sanchez* (2016)

7

63 Cal.4th 665, 674.)  However, the extraction reports in this case were created with very limited human involvement.  All Saar and Bak had to do was connect the phones to the Cellebrite device, and the data from the phones was automatically downloaded and formatted into readable reports that consisted solely of machine-generated information. Because the human input needed to create the reports was minimal, and they reflect the work of a computer, not a person, they do not implicate the hearsay rule.  (*People v. Goldsmith* (2014) 59 Cal.4th 258 [computer-generated data does not constitute hearsay]; *People v. Abad* (Co.App. 2021) __ P.3d __, __ [2021 W.L. 280531] [phone extraction reports are not hearsay]; *Gayle v. State* (Fla.App. 2017) 216 So.3d 656, 659 [same].) Thus, like appellant's challenge to the accuracy of the extraction reports, his hearsay challenge to the reports is not well taken.  Defense counsel was not ineffective for failing to object to the extraction reports on hearsay grounds.[3]

Appellant also challenges the contents of the extraction reports, which contain a verbatim description of the text messages that were sent and received on the phones.  Unlike the reports themselves, to which he did not object, defense counsel did object to the text messages on several grounds, including hearsay and lack of foundation. However, the trial court overruled his hearsay objection on the basis the statements in the messages attributable to appellant constituted admissions under Evidence Code section 1220, and appellant does not challenge that ruling on appeal.

Appellant's foundational objections went to the issue of authorship.  At trial, he objected to the text messages on the basis there was insufficient evidence to prove that he and the victims were the ones who actually composed and sent them.  The trial court agreed at first.  Early on during the prosecutor's direct examination of Officer Santibanez, the court sustained several objections to questions and answers that assumed

---

[3]    Respondent contends the extraction reports satisfied the business records exception to the hearsay rule.  (See Evid. Code, § 1271.)  Given our holding the reports were not hearsay, we need not consider this claim.

8

appellant and the victims were responsible for the text messages depicted in the extraction reports.

However, defense counsel failed to renew those objections during Santibanez's testimony, even as Santibanez continued to attribute the messages to appellant and the victims. Appellant would have us believe this failure constituted ineffective assistance of counsel. He also claims his attorney was derelict for failing to challenge the prosecutor's underlying assumption that the phones actually belonged to appellant and the victims. These claims do not hold water.

As to the latter point about ownership of the phones, the record shows the victims' phones were found in appellant's car along with their personal belongings, and appellant's phone was found on his person. When the victims got to the police station, they voluntarily gave Santibanez the passcodes to their phones, and he reviewed the contents of their phones with them. There was no evidence of the victims disputing ownership of the phones, and in fact, JD1's full name was embedded within the identification number of her phone.

Moreover, the phones contained a wide assortment of photos of appellant and the victims. The photos suggested the victims were working as prostitutes for appellant and bringing in large stacks of money for him. Since the text messages on the phones centered around the topic of prostitution, the photos corroborated the prosecution's theory that the text messages were the work of appellant and the victims.

In fact, in some of the messages sent from appellant's phone, he actually identified himself by name. For example, he identified himself as "Eric" to Shybaby, and in response to a text from JD1's phone, appellant said his handle on a particular app was "Eric Elijah Allen." Judging from the context of that exchange, it appears JD2 was the one who was actually messaging with appellant at that time. During the exchange, she referred to appellant as "Daddy" and apologized for not having her own phone with her.

9

She told appellant she did not think she needed her phone at the time because she was with JD1, whom she referred to by name several times.

Taken as whole, there was sufficient evidence from which jury could reasonably conclude the phones belonged to appellant and the victims, and they were the ones who composed the messages that were set forth in the extraction reports. (See *People v. Goldsmith, supra*, 59 Cal.4th at p. 267 ["'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences may be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.'"].) Therefore, defense counsel was not remiss for failing to object more persistently to the messages reflected in the reports.

That brings us to the admissibility of the online prostitution ads and the incriminating posts that were found on appellant's Instagram account. Appellant contends his attorney should have challenged this evidence for lack of authenticity because no one from the ad company or Instagram testified about the protocols for creating content on their sites or how easy or difficult it would be for someone to post information in another person's name. Appellant simply does not believe there was a sufficient showing that he and the victims were responsible for the ads and Instagram posts that were found on their phones.

We fully appreciate the fact that not everything on the Internet is as it appears. As one court has noted, "'Anyone can put anything on the Internet. No web-site is monitored for accuracy and *nothing* contained there is under oath or even subject to independent verification absent underlying documentation. [We] hold[] no illusions that hackers can adulterate the content of *any* website from *any* location at *any* time.' [Citation.]" This observation in *People v. Beckley* (2010) 185 Cal.App.4th 509, 515-516, has only grown clearer and more in the eleven years since it was decided.

But the advertisements offering prostitution services in this case were found *on JD2's phone*, and they contained multiple photographs of the victims. They also

10

referenced JD1's working name, Million Dollars, which is how appellant listed her among the contacts on his phone. And of course, the other evidence in the case firmly established the victims were actively involved in the very type of prostitution activities that were being offered in the ads. In the light of such damning facts, we cannot say defense counsel was negligent in failing to challenge the authenticity of the ads.

As for the Instagram evidence, it consisted mainly of a photograph found on JD2's phone that was attributed to appellant's Instagram account. The photo depicts appellant and JD2 flashing stacks of money, along with a series of posts suggesting the money was obtained through pimping and prostitution. The username on the account is listed as "moedollass."

Appellant argues anyone could have created the account and posted the picture without his knowledge. However, the victims' phones contained similar photos of appellant and the victims with money, and one of those pictures was adorned with the name "Moe Dollas." Furthermore, Santibanez testified that when he examined the phones at the police station, one of them was actually logged onto the account. Considered in conjunction with the text messages implicating appellant in pimping activity, we are convinced there was plenty of evidence from which the jury could reasonably conclude the account was his, so we do not believe defense counsel was ineffective for failing to challenge the authenticity of the account or the information that was posted on it.

*Expert Testimony*

Appellant contends Detective Saar's testimony about the phone evidence exceeded the scope of permissible expert testimony and lessened the prosecution's burden of proof by invading the jury's province to determine the truth of the charges. While conceding Saar was entitled to decipher the phone evidence for the jury and explain what it generally signified in the prostitution subculture, appellant maintains Saar went too far by opining the phone evidence signaled appellant was actually involved in

11

the charged offenses.  We agree with both parties that some of Saar's testimony amounted to an improper opinion about appellant's guilt.   However, given the jury's split verdict in this case, we do not believe that aspect of Saar's testimony was prejudicial to appellant.

As a preliminary matter, respondent claims appellant forfeited his right to challenge Saar's testimony on the ground it exceeded the scope of permissible expert testimony because he did not object to Saar's testimony on that basis in the trial court, nor did he object to Saar's testimony linking him to the charged offenses.  This claim is well taken.  Although appellant raised one foundational objection early on during Saar's testimony, he did not object on foundational grounds beyond that.  Nevertheless, we will address the merits of appellant's argument because he alleges his attorney was ineffective for failing to preserve it for appellate review.  Looking at the issue through that lens, we must determine whether reasonably competent counsel would have objected to Saar's testimony, and if so, whether it is reasonably probable appellant would have obtained a more favorable verdict had Saar's improper testimony been excluded.  (*Strickland* v. *Washington, supra,* 466 U.S. at p. 687.)

Opinion testimony by an expert is admissible in a criminal prosecution "in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience." (*People v. Torres* (1995) 33 Cal.App.4th 37, 45; Evid. Code, § 801, subd. (a).)  "By and large, the relationship between prostitutes and pimps is not the subject of common knowledge. [Citations.]" (*United States v. Taylor* (9th Cir. 2001) 239 F.3d 994, 998.)  Therefore, expert testimony on this topic, as well as the subculture of pimps and prostitutes, is generally permissible. (*Ibid*.; *People v. Leonard* (2014) 228 Cal.App.4th 465, 493, fn. 3.)

However, an expert "may not express an opinion on a defendant's guilt. [Citations.]  The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.]  'Rather,

12

opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

In this case, expert witness Saar not only testified about the prostitution subculture generally, and what the information found on the phones represented in that subculture. He additionally opined this information signaled appellant and the victims were actively involved in prostitution and pimping activity. For example, he said that when the victims referred to appellant as "Daddy" in their messages to him, they were referring to their pimp. And when they told appellant they were going on dates, they were letting him know they were working the streets and bringing in money for him. Although this is very close to the perfectly permissible, "This kind of language is used in the subculture to indicate . . ." kind of testimony we usually see in these cases, it does go too far. Although Saar sometimes limited himself to saying certain phone evidence "was consistent with" prostitution activity, which was within his prerogative as an expert witness, he ultimately opined that there was some type of pimping and prostitute relationship going on between appellant and the victims. He also expressed his opinion that appellant was holding the victims against their will. This testimony went beyond the realm of permissible expert testimony because once Saar explained what the phone evidence meant in general terms, it was up to the jury to decide whether that evidence was sufficient to convict appellant of the charged offenses. Therefore, defense counsel was remiss in failing to object to Saar's opinions about appellant's guilt.

Still, we do not believe appellant was prejudiced by Saar's improper opinion testimony. At least he has not shown it is reasonably probable he would have obtained a more favorable result had those opinions been excluded from his trial, which is the standard for assessing prejudice when defense counsel has been shown to be

13

ineffective in some respect. (See *Strickland* v. *Washington, supra,* 466 U.S. at p. 687.) That conclusion follows from the jury's verdict and the nature of Saar's testimony.

Recall, appellant was charged with aggravated assault, kidnapping, pimping, pandering and human trafficking. However, the jury acquitted him of pimping and deadlocked on the human trafficking count, which was ultimately dismissed. Obviously, Saar's testimony did not prejudice appellant on those charges. And the erroneous testimony was irrelevant to the assault and kidnapping charges, which were proven by surveillance footage capturing appellant's attack on JD1 in the motel lobby and parking lot. That leaves the pandering charge for our consideration.

As it turned out, Saar did not specifically address that charge in his testimony. He opined appellant was a pimp and human trafficker, but he did not offer any opinion about whether appellant encouraged the victims to become or remain prostitutes, which was the basis for the pandering charge. Nevertheless, as defense counsel strategically conceded in closing argument,[4] the phone evidence alone made clear appellant "was persuading, assisting, and procuring [the victims] to be prostitutes. There's no question about that." Indeed, the information on the phones plainly revealed appellant was directing and monitoring the victims' prostitution activities. Since, in the words of defense counsel, there was "tons of evidence" apart from Saar's expert opinions to support the pandering charge, defense counsel's failure to challenge those opinions is not grounds for reversal.

*Sentencing*

Appellant was 21 years old at the time he committed the crimes at issue in this case. However, because he was sentenced as a repeat offender under the Three Strikes Law he is not eligible for the type of early parole consideration that is generally

---

[4] Conceding charges with strong evidence – thereby saving focus and credibility for charges with weaker evidence – is a common and reasonable defense strategy. Many of the complaints made by appellant in this case appear to be Monday-morning quarterbacking of unsuccessful strategic choices.

afforded youthful offenders.  Appellant contends that restriction violates equal protection principles, but we cannot agree.

The trial court sentenced appellant to a base term of 10 years and 8 months in prison for his crimes.  Given that appellant had suffered a prior strike conviction, the court doubled that term pursuant to the Three Strikes Law.  (Pen. Code, § 667, subd. (e)(1).)  It then added a 5-year term, based on the fact appellant had also previously been convicted of a serious felony (*id*., subd. (a)(1)), bringing appellant's total sentence to 26 years, 4 months.

Appellant's equal protection argument is grounded in the fact he was only 21 years old at the time he committed his offenses.  Typically, when a defendant receives a determinate sentence for crimes he committed when he was under the age of 25, he is entitled to early parole consideration in the form of a youthful offender parole hearing during the 15th year of his incarceration.  (Pen. Code, § 3051, subd. (b)(1).)  But when, as here, the defendant is sentenced pursuant to the Three Strikes law, he is not eligible for such a hearing.  (*Id*., subd. (h).)  Although appellant would have us believe this scheme violates equal protection, that is not the case.

In order to make out a valid equal protection claim, the defendant must first show he is similarly situated to other defendants who receive more favorable treatment under the law in question.  (*People v. Morales* (2016) 63 Cal.4th 399, 408.)  In other words, appellant must show he is the same or similar as youthful offenders who have not suffered any prior strike convictions.  However, the law is well established that defendants with prior strikes are not comparable to such offenders.  (*People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1165-1166.)  This dooms appellant's equal protection claim from the outset.  (*Ibid*.)

Moreover, even if we assumed youthful offenders with prior strikes were similarly situated to youthful offenders without prior strikes, "the Legislature could rationally determine that the former – 'a recidivist who has engaged in significant

15

antisocial behavior and who has not benefited from the intervention of the criminal justice system' [citation] – presents too great a risk of recidivism to allow the possibility of early parole." (*People v. Wilkes, supra,* 46 Cal.App.5th at p. 1166.)  Therefore, "the differential treatment of youth offenders sentenced pursuant to the Three Strikes Law for purposes of youth offender parole hearings does not violate equal protection."  (*Id*. at p. 1167.)

DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

IKOLA, J.

GOETHALS, J.

16